**La CHEMISE LACOSTE, a French corporation, Plaintiff,**

v.

**The ALLIGATOR COMPANY, a Delaware corporation, Defendant and Third-Party Plaintiff,**

v.

**JEAN PATOU, INC., a New York corporation, Third-Party Defendant.**

**Civ. A. No. 3876.**

United States District Court,
D. Delaware.

March 21, 1974.

---

---

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., W. Brown Morton, Jr., Donal B. Tobin and Donald N. Huff of Morton, Bernard, Brown, Roberts & Sutherland, Washington, D. C., Robert Abdesselam, Paris, France, of counsel, for plaintiff and third-party defendant.

Lewis S. Black, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Abraham G. Levin, Irving Constant, Brian L. Bilzin of Rubin, Wachtel, Baum & Levin, New York City, Arthur H. Seidel and Allen L. Greenberg of Seidel, Gonda & Goldhammer, Philadelphia, Pa., of counsel, for defendant.

## OPINION

LATCHUM, Chief Judge.

La Chemise Lacoste, a French corporation ("LCL"),[1] instituted this action[2] against the Alligator Company, Inc. ("Alligator")[3] seeking a declaratory

---

1. LCL was formed about 1934. After 1936 LCL ("LCL I") was operated as a "Societe a Responsibile Limitec" S.A.R.L. About 1945, LCL I changed its form of corporate organization to a "Societe Anonyme" S.A., the present LCL II. "LCL" will be used to refer to the present plaintiff and its prede-

cessors except where the context may require a more precise designation.

2. Docket Item 1.

3. "Alligator I" was a Delaware corporation of St. Louis, Mo. On June 11, 1965 Alligator I sold all its assets to The Alligator Co.,

judgment that it has the right to use a distinctive crocodile emblem [4] as a trademark on toiletries distributed in the United States by the third-party defendant Jean Patou, Inc. ("Patou"). Alligator responded by asserting that the sale by LCL through Patou of toiletries in the United States bearing the crocodile emblem infringes upon Alligator's trademark rights and constitutes unfair competition.[5]

LCL further seeks relief from alleged breaches by Alligator of certain contractual obligations to LCL [6] which arose out of a settlement of an infringement suit in 1958 brought by Alligator against LCL's then licensee, David Crystal, Inc. ("Crystal").[7]

LCL commenced the present suit on March 4, 1970 against Alligator in the Court of Chancery of the State of Delaware in and for New Castle County. The case was thereafter removed to this Court pursuant to 28 U.S.C. § 1441. La

Chemise Lacoste v. Alligator Co., 313 F. Supp. 915 (D.Del.1970).

In the early 1950's LCL attempted to introduce into the United States a sport shirt called "Chemise Lacoste" which had the crocodile emblem affixed to the shirt over the left breast. In an effort to secure an effective means for distributing the "Chemise Lacoste" shirt, LCL sought the services of Crystal. LCL and Crystal first formalized their relationship in a License Agreement [8] dated October 1, 1951 whereby LCL gave to Crystal the exclusive right to sell in the United States all tennis and golf shirts known as "Chemise Lacoste" made by LCL. At the same time, LCL granted Crystal the exclusive right to use in the United States all trademarks, trade names and insignia of LCL in connection with the advertising and sale of merchandise purchased by Crystal from LCL.

While LCL was establishing an effective means for distributing its goods in

Inc. ("Alligator II") a Delaware corporation, owned by B.V.D. Corp., which was in turn owned by Glen Alden Corp. On September 22, 1970, Alligator II changed its name to Friedman-Marks, Inc. and caused the organization in Delaware of a new corporation called The Alligator Co., Inc. ("Alligator III"). On September 25, 1970 Friedman-Marks, Inc. transferred all the assets of its The Alligator Co. Division to Alligator III. On December 3, 1970 General Mills, Inc. acquired all the stock of Alligator III from Friedman-Marks, Inc. Alligator II was the original defendant in this case but Alligator III has been substituted therefore by stipulation dated February 3, 1971 and is the current defendant. "Alligator" will be used to refer to the present defendant and all its predecessors except where the context may require a more definite designation.

4. LCL alleges that a crocodile emblem has been for many years associated with M. Rene Lacoste, founder and still a principal officer of LCL, having originated during M. Lacoste's career as a Davis Cup tennis player as his personal symbol and having become the commercial property of LCL as a trademark identifying its products throughout Delaware, the United States, France and the world.

5. Docket Item 8.

6. In its answer (Docket Item 8) to LCL's original complaint (Docket Item 1) Alligator

asserted, *inter alia*, a counterclaim that LCL had breached contractual obligations to Alligator. LCL then attempted to join additional parties as defendants pursuant to Rule 19(a), F.R.Civ.P., claiming they were needed for just adjudication of this counterclaim. (Docket Items 22 and 69). This Court refused to join the additional parties, La Chemise Lacoste v. General Mills, Inc., 53 F.R.D. 596 (D.Del.1971) aff'd 3 Cir., 487 F.2d 312 (filed September 6, 1973, Docket Item 372), but granted LCL's motion to file an amended and supplemental first counterclaim containing the breach of contract allegations. (Docket Items 126 and 148). Alligator thereafter dropped its contract counterclaim. (Docket Item 371, pp. 28–29).

7. The original David Crystal, Inc. ("Crystal I") is now defunct. Crystal I, a New York Corporation organized a Delaware subsidiary, also named David Crystal, Inc. ("Crystal II") and merged into Crystal II on April 15, 1968. On September 23, 1969 Crystal II merged into General Mills, Inc. and the same day General Mills, Inc. transferred all the assets and liabilities of Crystal II to D. C. Fashions, Inc. On the same day, D. C. Fashions, Inc. changed its name to David Crystal, Inc. ("Crystal III"). "Crystal" will be used to refer jointly to Crystal III and all its predecessors except where the context may require a more definite designation.

8. Plaintiff's exhibit (PX) 659.

the United States, LCL was also attempting to secure a trademark registration by filing an application covering the crocodile emblem for use on shirts.[9]

The Patent Office entered a final rejection to this application on April 10, 1953, based on Alligator's trademark Reg. No. 251,201.[10] Although LCL tried several times to secure Alligator's permission to register the crocodile emblem,[11] permission was withheld each time.[12] Thus, the sale of the "Chemise Lacoste" shirt with the crocodile emblem by Crystal continued in the United States without benefit of a formal trademark registration of the emblem.

On May 6, 1954 LCL filed an application for a trademark on the word "crocodile" in the form of the crocodile emblem (S.N. 665,827) for use on shirts, and on December 28, 1955 an application was filed by LCL on the same mark (S. N. 700,736) for use on socks, shorts and dresses.[13] On December 19, 1955 LCL filed an application for a trademark on the crocodile emblem itself (S.N. 700,419) for use on sporting goods.[14] All of these applications were opposed by Alligator.[15]

Alligator filed suit against Crystal on December 10, 1956 in the Southern District of New York, Civil Action 115–272 (the "1956 suit"),[16] in which Alligator sought to enjoin Crystal's use of the crocodile emblem in the United States. After considerable negotiations, a settlement was reached between Alligator and Crystal which included the entry of a Consent Judgment on September 22, 1958.[17] Since the dealings of LCL, Crystal and Alligator relating to the settlement of the 1956 suit form a major basis for LCL and Alligator's allegations in the present suit, it is necessary to consider the 1958 settlement in some detail.

### The 1958 Settlement

Although Crystal was the only named defendant to the 1956 suit, Crystal, soon after suit had been brought, transmitted Alligator's complaint to LCL's United States trademark attorney for comments and suggestions.[18] In addition, between January 2, 1957 and October 23, 1957 LCL cooperated with Crystal by supplying information which Crystal had requested for use in the defense of Alligator's suit.[19]

However, despite that cooperation, Crystal did not keep LCL posted on the developments of the 1956 suit. As explained by Robert Abdesselam, LCL's French attorney, "La Chemise Lacoste heard very little during that year, those two years, end of '56 to mid-'58, about what was going on."[20] Be that as it may, Crystal did request monetary aid from LCL[21] and did ultimately receive $5,000[22] to help defray Crystal's cost of defending the suit brought by Alligator.

In defense of Alligator's allegations of trademark infringement and unfair competition set forth in the 1956 suit, Crystal asserted, *inter alia,* (1) that two of Alligator's registered trademarks, upon which Alligator was relying, were invalid, (2) that Alligator was not the owner of and had no exclusive rights to the crocodile emblem, and (3) that Crystal's use of the crocodile emblem was not like-

---

9. Docket Item 368, Appendix A, p. 12.

10. Id. Alligator's trademark Reg. No. 251,201 is the word "Alligator" written in script for use on a number of listed articles of apparel all made of waterproofed fabric. PX 670.

11. Defendant's Exhibit (DX) 3, DX 10.

12. DX 6, DX 12.

13. Docket Item 368, Appendix A, pp. 12 and 13.

14. Id., p. 15.

15. Id., pp. 12, 13 and 15.

16. DX 25.

17. DX 56.

18. PX 138.

19. PX 140, 141, 142, 143, 144, 145, 146 and 457.

20. Docket Item 234, p. 40.

21. PX 168.

22. Docket Item 368, Appendix A, p. 9.

ly to cause confusion, mistake or deception with purchasers as to the source of Crystal's goods.[23] The 1956 suit never came to trial. Instead, Crystal and Alligator entered into a formal Settlement Agreement.[24] The Settlement Agreement had attached to it a Consent Judgment [25] to be entered by Crystal in the 1956 suit, a License Agreement from Alligator to Crystal,[26] and a Letter of Consent to be signed by LCL.[27] Signed copies of the Settlement Agreement together with the Consent Decree and License Agreement were exchanged between Crystal and Alligator on July 21, 1958 and held in escrow pending the receipt of the LCL Letter of Consent. Three days before the July 21, 1958 exchange, Alligator also agreed with Crystal to discontinue its opposition to LCL's trademark application on sporting goods, (S.N. 700,419), which later became Reg. No. 688,685.[28]

The Settlement Agreement consisted of seven paragraphs. The first paragraph provided that the Consent Decree would be submitted to the New York District Court for approval to end the 1956 suit pending there. The second paragraph provided that the License Agreement would be executed by the parties upon approval of the Consent Decree by the New York District Court. In the third paragraph Crystal agreed to cooperate, short of suit, to prevent retailers from using the word "Alligator" or otherwise violating the License Agreement. The fourth paragraph provided for publication of the settlement in appropriate trade journals and to inform customers of Crystal directly by letter. In the fifth paragraph Crystal agreed to deliver to Alligator the Letter of Consent from LCL at the time of execution of the License Agreement. The sixth paragraph provided the parties would take reasonable action to make the Set-

tlement Agreement effective. Finally, the seventh paragraph defined the term "articles of apparel" used in the Consent Decree and the License Agreement and included by way of illustration such things as: hosiery, gloves and corsetry.

The Consent Decree, which was attached to the Settlement Agreement as Exhibit "A", had four provisions. First, Crystal admitted that the two registered trademarks on which Alligator was suing were valid and that Alligator was:

" . . . the owner of valid common-law trademark rights, which statutory and common-law rights give it priority and primacy over any alleged rights of defendant [Crystal] in connection with any use of the words 'alligator' or 'crocodile' or the name of any lizard-like reptile or pictorial representation of an alligator or crocodile or other lizard-like reptile as a mark or symbol to designate the source of origin of articles of apparel." [Brackets added].

Second, Crystal admitted it had:

" . . . sold articles of apparel bearing or being advertised in connecton with the word 'crocodile' or pictorial representations of an alligator or crocodile as a mark or symbol to designate source of origin, and there is a likelihood of confusion in the mind of the public between plaintiff's [Alligator's] goods sold under or in connection with its above-recited registered and common-law trademarks and defendant's [Crystal's] goods sold as hereinabove recited as to the source of origin of the respective goods." [Brackets added].

Third, Crystal and:

" . . . its officers, agents, servants, employees and attorneys, and

---

23. DX 26.

24. PX 654.

25. PX 654, Exhibit A.

26. PX 654, Exhibit B.

27. PX 654, Exhibit C.

28. PX 186.

those persons in active concert or participation with them who receive actual notice of this decree, by personal service or otherwise, are hereby permanently enjoined from using the words 'alligator' or 'crocodile' or the name of any lizard-like reptile or pictorial representation of an alligator or crocodile or other lizard-like reptile as a mark or symbol for the purpose of or in a manner designating source of origin of articles of apparel in the United States, except as set forth in a written consent or agreement executed by plaintiff [Alligator]." [Brackets added].

Finally, a counterclaim asserted by Crystal against Alligator was dropped.

The License Agreement, which was attached to the Settlement Agreement as Exhibit "B", had nine paragraphs of which the following appear most pertinent to this suit:

"1. Crystal acknowledges that Alligator has the sole and exclusive right to use as a trademark on or in connection with the sale in the United States of articles of apparel the words 'alligator' and 'crocodile', the name of any lizard-like reptile, and pictorial representations of an alligator or crocodile or other lizard-like reptile.

2. (a) Alligator hereby grants Crystal the exclusive right, under Alligator's broader right acknowledged in Article 1 hereof, and under any and all other and additional rights Alligator may hereafter have or obtain, to use only the word 'crocodile' and/or only the pictorial representations of a lizard-like reptile in substantially the forms annexed as Schedules 'A', 'B' and 'C' hereto, heretofore used or created by the French firm La Chemise Lacoste of Paris, only upon or in connection with the sale in the United States in the course of Crystal's business as it presently exists or may hereafter be lawfully continued and expanded, of the particular articles of apparel defined on Schedule 'D' annexed hereto.

(b) . . . Alligator will not manufacture, sell or distribute articles of apparel, irrespective of quality, in the licensed categories set forth in Schedule 'D' under or in connection with the words 'alligator' or 'crocodile', the name of any lizard-like reptile, or the pictorial representation of an alligator or crocodile or other lizard-like reptile, except that, anything herein to the contrary notwithstanding, Alligator may manufacture, sell or distribute slacks.

4. . . . Nothing in this Agreement shall be construed as a waiver, express or implied, of any right of either party with respect to any trademark, tradename, word, symbol, or insignia in any field outside the apparel field.

7. Alligator agrees, so long as the rights granted in Article 2 hereof to Crystal are not terminated, not to grant to any third person any right to use the words 'alligator' or 'crocodile' or the name of any lizard-like reptile or a pictorial representation of an alligator or crocodile or other lizard-like reptile on or in connection with the sale in the United States of articles of apparel not distributed by Alligator. . . ."

The remaining provisions of the License Agreement pertain to procedures by which Alligator could police the quality of Crystal's goods sold under the license, procedures by which additional items could be added to Schedule "D", and procedures by which the license could be enforced by each party against each other and against third parties who infringed Alligator's trademark rights as admitted by Crystal.

The form of the Letter of Consent, which was attached to the Settlement

Agreement as Exhibit "C" is reproduced below in toto:

"The Alligator Company
St. Louis, Missouri
Gentlemen:

Re: Settlement of Lawsuit, Civil Action No. 115–272, United States District Court, Southern District of New York, The Alligator Company, Plaintiff vs. David Crystal, Inc., Defendant.

In order to induce you to settle the subject lawsuit, we are writing this letter at your request.

1. We acknowledge that we have read a certain Agreement dated July 21, 1958, between yourselves and David Crystal, Inc., and the exhibits, 'A', 'B', and 'C' (the form of this letter), attached thereto. We approve of said Agreement and its said exhibits and consent to the acceptance by David Crystal, Inc. of the License Agreement, which is said Exhibit 'B'.

2. In view of the foregoing, we will execute such papers as are necessary to accomplish a formal abandonment of our United States Trade-Mark Applications Serial Nos. 665,-827, filed May 6, 1954, and 700,736, filed December 28, 1955, and a consequent sustaining by default of your Opposition No. 35,863 in the United States Patent Office involving the first of said applications.

Very truly yours,
La Chemise Lacoste

By _____
 Rene Lacoste"

Alligator's stipulation to discontinue its opposition to LCL's trademark application (S.N. 700,419) on sporting goods was not physically incorporated into the Settlement Agreement but rather appeared in a letter dated July 18, 1958 from W. Brown Morton, Jr., then Alligator's attorney, to Irving Constant, then Crystal's attorney.[29]

On July 22, 1958, Crystal broke the news of the settlement to LCL,[30] which had theretofore been kept in the dark[31] and urged LCL to sign the Letter of Consent so that Crystal could consummate the settlement with Alligator. LCL balked at signing the letter without first getting some answers to many questions raised by the agreement.[32] In particular Rene Lacoste directed Robert Abdesselam to seek answers to certain questions, and thus Abdesselam sent a letter to Irving Constant, Crystal's then attorney, expressing LCL's fears as to some of the settlement provisions and asking questions of other provisions.[33]

29. "In connection with our conference of July 17, 1958 about the settlement of trademark controversies between David Crystal, Inc. and The Alligator Company, there was produced a box of a dozen LACOSTE golf balls made in England and distributed in the U. S. by Crystal. These balls, their individual wrappings, and the box bore pictorial representations of a lizard-like reptile, both with and without a golf ball in its mouth and the word-mark 'Lacoste'.

I am authorized to state that The Alligator Company has no present objection to the sale and distribution of these balls thus marked and packaged, based on examination of the box produced and on trade information received by us to date.

It is understood that this letter does not preclude The Alligator Company from taking such action with respect to the sale of golf balls under a mark including the name or pictorial representation of an alligator or crocodile or other lizard-like reptile as actual developments in the trade not now known to it may at some future time dictate. It is further understood that Mauro & Lewis will sign [LCL's then United States patent attorneys] on behalf of Lacoste, the enclosed forms or such other papers as the Patent Office may require to secure the discontinuance, without prejudice, of Opposition No. 36,371." [Brackets added]. PX 186.

30. PX 190.

31. Docket Item 234, p. 41.

32. PX 192.

33. In the letter, (PX 193), Abdesselam indicated to Constant that LCL was concerned *inter alia:* (1) that the publicity provided for in the Settlement Agreement announcing LCL no longer owned the trademarks used by LCL was very dangerous for the future of LCL's business, (2) that any such publici-

Constant replied that since time was so critical, a personal meeting in New York would be the most efficient way to answer Abdesselam's inquiries.[34] That meeting was held during the week of August 11, 1958 and resulted in the execution of Amendment No. 4 to the 1951 LCL–Crystal Agreement.[35]

Amendment No. 4 was one condition to LCL's furnishing the Letter of Consent needed by Crystal for the settlement with Alligator.[36] Another condition was that Alligator supply a letter [37] to Crystal, assuring Crystal and LCL that Alligator would claim no right to the name of Lacoste in any form.[38] Then, by letter dated August 15, 1958, LCL approved the Crystal–Alligator settlement.[39] The Consent Judgment and License Agreement were signed by Alligator's president, Paul Simon, on September 16, 1958.[40]

### The Contract Issue

There is no material dispute as to the facts surrounding the Settlement Agreement, but LCL and Alligator differ widely as to the agreement's effect. LCL argues that it was a *party* to the 1958 settlement and, hence, the terms of the Settlement Agreement, in particular Paragraph 7 of the License Agreement, can not be altered without LCL's consent. As may be expected, Alligator

---

ty should be first approved by LCL, (3) that the sale of the Lacoste shirt and other LCL products would be harmed by having many articles, such as those listed in the seventh paragraph of the Settlement Agreement, on the market bearing the Lacoste trademarks and design, (4) that Alligator really intended to use the crocodile emblem on hosiery, gloves or corsetry, (5) that Alligator may have the sole and exclusive right to use the word "crocodile" as a trademark, (6) that the words "additional rights Alligator may obtain" in Article 2(a) of the License Agreement did not sufficiently protect LCL and Crystal's rights, especially since "Alligator and Lacoste have no legal relationship", (7) that Crystal and LCL were at the mercy of Alligator's control over the quality of goods, (8) that the License Agreement which had no termination date may be terminated for material breach by Crystal, even during the life of the Crystal–LCL Agreement which was to terminate in 1961, (9) that an assignee of Crystal's whole business who did not choose to renew the Crystal-LCL Agreement might manufacture any articles of apparel bearing the crocodile emblem by virtue of only the Alligator-Crystal Agreement, (10) that Alligator could use the word "Lacoste" in the form of an alligator, (11) that shorts were included in Schedule "D" and that Alligator could therefore manufacture them, (12) that without a special agreement with Alligator, LCL might be put in an awkward worldwide trademark position, and finally Abdesselam wanted his understanding confirmed that Alligator would not register Lacoste trademarks in the United States, and he wanted his belief made of record that LCL should have a legal connection with Alligator.

34. PX 197.

35. PX 660. In Amendment No. 4, LCL recognized that Crystal had acknowledged Alligator as the owner of statutory and common law rights in the words "Alligator", "Crocodile", and the name of *any* lizard-like reptile and pictorial representations of an alligator or crocodile or other lizard-like reptile and that Alligator granted Crystal the exclusive use to the word "crocodile" and the crocodile emblem upon or in connection with articles of apparel listed in Schedule "D" of the License Agreement. Generally, Amendment No. 4 (1) extended the LCL-Crystal Agreements to 1985, (2) required Crystal to notify LCL of any complaints by Alligator, (3) allowed Crystal to sell or assign its whole business connected with the word "crocodile" and the crocodile emblem, only subject to the LCL-Crystal Agreements, (4) provided royalties to LCL for sale by Crystal of articles in Schedule "D" of the License Agreement, except for shirts and socks sold pursuant to existing LCL-Crystal Agreements, (5) prohibited LCL from using the names "La Chemise Lacoste", or "Lacoste" or the crocodile emblem in connection with any articles sold in the United States should the agreement not be renewed in 1985, (6) provided a mechanism for Crystal's obtaining a new manufacturer should the manufacturer selected by LCL not meet a high enough standard.

36. Docket Item 368, Appendix A, par. 30.

37. PX 209.

38. Docket Item 368, Appendix A, par. 30.

39. PX 206. The August 15, 1958 letter was signed by Robert George, then President of LCL. Later, at Alligator's request Rene Lacoste himself endorsed the August 15 letter. PX 204.

40. PX 220.

takes the opposite view and asserts that LCL was not a party and, hence, only Crystal or its assignee need consent to amend the License Agreement.

In July 1970, Alligator and Izod, Ltd.,[41] Crystal's assignee, did enter into an amendment [42] of the License Agreement without the consent of LCL, by which Alligator was completely released from the terms of Paragraph 7, which prohibited Alligator from licensing third parties to use the words "alligator" or "crocodile" or the name of any lizard-like reptile or a pictorial representation of an alligator or crocodile or other lizard-like reptile on or in connection with the sale in the United States of articles of apparel not distributed by Alligator. In return, Alligator granted to Izod the right to distribute eleven new categories of apparel with the crocodile emblem. Thereafter on January 1, 1971, Alligator licensed [43] Knothe Brothers Company, Inc. ("Knothe") to distribute certain men's sleepwear utilizing various reptilian trademarks including the crocodile emblem.[44]

In this action,[45] LCL first claims that the cancellation of Paragraph 7 of the License Agreement without the prior knowledge or approval of LCL was a breach of contract. Second, LCL claims that Alligator breached its contract when it licensed Knothe to use the croco-

dile emblem in the sale of apparel. Third, LCL claims that when Alligator filed trademark applications on the crocodile emblem [46] and the mirror image [47] of the crocodile emblem it breached its contractual obligations with LCL. Finally, LCL claims that Alligator's opposition to several trademark applications by Lacoste to register the crocodile emblem for various toiletries and soaps [48] also violated the purported contractual relations between Alligator and LCL.

 Since this is a diversity action, this Court is bound to apply Delaware's conflict of law rules. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). When determining the validity and construction of a contract, Delaware courts look to the law of the place where the contract was made. Sears, Roebuck and Co. v. Jardel Co., 421 F.2d 1048, 1051 (C.A.3, 1970); Hood v. McConemy, 53 F.R.D. 435, 443 (D.Del.1971). The Settlement Agreement, entered into in New York, provided that the Consent Decree would be entered in the 1956 suit pending in the United States District Court for the Southern District of New York, which it was. The License Agreement also makes it clear that the parties intended the agreement to be controlled by New York law. Consequently, the law of New York is determinative as to

---

41. Izod, Ltd. ("Izod") is a New York corporation. It was incorporated in 1956 but remained a corporate shell. Before December 1, 1959, Crystal I had an Izod Division in which it operated a men's wear business. On December 1, 1959 Izod was activated and the entire business of Crystal I's Izod Division was transferred to Izod and Izod has since remained a wholly owned subsidiary of Crystal I, II and III. As of December 1, 1959, Crystal assigned all its business in apparel bearing the crocodile emblem, including the 1958 License Agreement from Alligator to Crystal and LCL's Agreement with Crystal, to Izod. This assignment of the Alligator license to Izod was without the prior knowledge or consent of LCL. Docket Item 368, Appendix A, par. 4.

42. PX 658. An earlier amendment to the 1958 License Agreement (October 14, 1968, PX 658) between Izod and Alligator re-

leased Alligator from Paragraph 7 with respect to rainhats and rainboots while Izod obtained additional articles of apparel in Schedule "D".

43. Plaintiff's Exhibit 27 to Docket Item 159.

44. Described as S.N. 364,539 in the license agreement between Knothe and Alligator.

45. Docket Item 126.

46. S.N. 364,539, see Docket Item 368, Appendix A, p. 32, suspended pending outcome come of this suit.

47. S.N. 350,199, see Docket Item 368, Appendix A, p. 32., suspended pending outcome of this suit.

48. S.N. 298,454 (cosmetics) and S.N. 303,174 (soaps) both suspended pending outcome of this suit. Docket Item 368, Appendix A, p. 13.

the existence and construction of any contract between LCL and Alligator arising from these instruments.

■ The New York law holds that generally none but a party to, or a third-party beneficiary of, a contract has the right to sue for breach of the contract. Fleischer v. W. P. I. X., Inc., 30 Misc.2d 17, 213 N.Y.S.2d 632, 643 (Sup.Ct.1961), appeal dismissed 371 U.S 16, 83 S.Ct. 59, 9 L.Ed.2d 50 (1962). Hence, the preliminary question which must be considered is whether or not LCL was a party or third-party beneficiary to the License Agreement. LCL has chosen not to vigorously advance the argument that it was a third-party beneficiary[49] and has failed to present to the Court any New York cases which would suggest that LCL was such a beneficiary. The Court therefore is left to conclude that LCL has abandoned any third-party beneficiary arguments and relies solely on its assertion that LCL was a party to the overall settlement, out of which a contractual arrangement arose between LCL and Alligator.

LCL's argument in this respect is basically two-fold. First, LCL argues that the composite instruments of the Settlement Agreement[50] in combination with LCL's position as exclusive licensor of Crystal, LCL's then trademark position in the United States, and LCL's arrangements with Alligator as to the then existing LCL trademark applications demonstrate by themselves that LCL was a party to an overall settlement of the trademark difficulties between Crystal, LCL and Alligator and, therefore, should be considered a party to a basic element of the settlement, namely, the License Agreement. Second, LCL contends that if the Court is not totally convinced by the first argument that Crystal and Alligator intended to make LCL a party, then additional evidence exists and has been offered purporting to show that they had continuously treated the composite agreements as tri-party and from this evidence the Court should conclude LCL was originally intended to be a party. LCL has in-

49. At Page 22 of its reply brief LCL states: "Alligator forgets that Crystal (Izod) has been since 1951 the exclusive licensee of Lacoste in the U. S. for the sale of apparel under the emblem (PX 659). The law is clear that an exclusive licensee operates as a fiduciary for the licensor. Whatever rights which Crystal may have gotten from Alligator necessarily were gotten primarily for Lacoste and only as thus acquired hence through Lacoste, for Crystal." [No citations given].

Of course, it is generally accepted that an exclusive licensee under the sufficient control of a licensor holds a licensed trademark in trust for the licensor in the sense that the licensee cannot generally use the trademark as his own after termination of the license. Pike v. Ruby Foo's Den [98 U.S. App.D.C. 126] 232 F.2d 683, 685 (C.A.D.C., 1956). Thus it would seem prudent for a third-party entering a contract with the licensee concerning the licensed trademark to seek the approval of the licensor so that the licensee will assuredly be held bound to the contract. But no cases have been cited by LCL or have been found independently by this Court which hold that the licensee was thereby acting as the agent of the licensor and, hence, that the licensor was thereafter

able to enforce the terms of the licensee-third party contract against the third party.

Furthermore, the law of New York holds that third party beneficiaries may recover only where the parties intended to confer a benefit upon them and they may not sue where their benefit is purely incidental to the main thrust of the contract. Compagnie Nationale Air France v. Port of New York Auth., 427 F.2d 951, 954 (C.A. 2, 1970). Here, Crystal's main intent in entering the Settlement Agreement with Alligator was to allow it to get on with its own business of dispensing LCL apparel using the crocodile emblem; Alligator's main intent was to preserve the integrity of its alligator and crocodile trademark position in the field of apparel; and both Crystal and Alligator intended to settle their dispute in a manner which would allow them to join together to eliminate the many imitators of the crocodile emblem who had appeared in the market place to reap the marketing advantages which had been built into the crocodile emblem. The fact LCL received royalty payments from Crystal for the sale of crocodile emblem bearing goods was merely incidental to the intent of Crystal and Alligator.

50. The Consent Decree, the License Agreement and the Letter of Consent from LCL.

deed failed to persuade the Court with either argument.

In the first place, the Settlement Agreement was not only not signed by LCL, but LCL was not even aware of its existence until after it was executed by Crystal and Alligator.[51] It was expressly entered into by and between Alligator and Crystal to "adjust and compromise controversies existing between them." [52] The only mention of LCL in the Settlement Agreement was (1) that news of the settlement will be reported by Crystal to "all of its customers who have in the past purchased Lacoste shirts from it or who are now carried as prospective puchasers of Lacoste shirts on its books and records" and (2) that Crystal will deliver to Alligator at the time the License Agreement is executed a "letter signed by La Chemise Lacoste, a French firm, approving and consenting to the terms of said License Agreement." The form of the Letter of Consent was attached to the Settlement Agreement. The Court concludes that these two mentionings of LCL, in light of the fact LCL neither signed nor was aware of the execution of the Settlement Agreement, were not alone sufficient to show that Crystal and Alligator intended to make LCL a party to the Settlement Agreement.

As for the Consent Decree, LCL is nowhere mentioned therein and, of course, did not sign the Decree.

Next, in the License Agreement itself, Crystal and Alligator expressly stated it was to be an agreement made and entered into by them. LCL is mentioned only once, in reference to the pictorial representations that Crystal was allowed to 'use on certain articles of apparel, these representations being described as theretofore used or created by the French firm La Chemise Lacoste of Paris. This recitation does no more than recognize that LCL previously used or created the crocodile emblem. In particular, this recitation does not suggest to this Court that Crystal and Alligator thereby intended to make LCL a party to the License Agreement. LCL's approval, already required by Alligator on the Letter of Consent, could therefore easily have been required to be affixed to the License Agreement itself had Crystal and Alligator intended to make LCL a contractually bound party to the License Agreement. No such authorization was requested by Crystal and Alligator or given by LCL.[53] In fact, LCL was no where else mentioned in the License Agreement.

The final formal element of the Settlement Agreement, the Letter of Consent, was, of course, signed by a LCL representative.[54] This Court concludes that the Letter of Consent was exactly that; a letter giving approval and consent and no more. It was given by LCL "[i]n order to induce you [Alligator] to

51. See Footnote 31 supra.

52. PX 654.

53. On the other hand, LCL was very concerned that they had no legal tie with Alligator, as witnessed ·by Abdesselam's letter of July 31, 1958 to Draddy of Crystal upon first learning of the settlement arrangements:

"I hate to make any suggestions before I know more about the general scheme. However I may say right now, that I sincerely believe Lacoste should have a legal connection with Alligator and that could be either by being party to the agreement between Alligator and Crystal or by entering into separate agreements with both Firms." PX 193.

On July 31, 1958 a representative of Crystal, Morgan Fauth, reported after meeting

with LCL executives that they thought LCL should be a party to the agreement. DX 187 and Docket Item 361.

By August 1958, Abdesselam was still hopeful LCL could enter into the agreement. DX 36 and DX 37. This Court recognizes that the July 31, 1958 letter by Abdesselam was merely a solicitation for explanation. However, his August 1958 communication carried no such tenor. Added to this is the fact that no material changes were made in the Settlement Agreement, Consent Decree, License Agreement or Letter of Consent from the time first seen by a LCL representative to the time the Letter of Consent was delivered by LCL.

54. See Footnote 39, supra.

settle the subject lawsuit [against Crystal]." The letter meant that (1) LCL had read the Settlement Agreement, (2) LCL approved of the Agreement and (3) LCL consented to having Crystal, its then exclusive licensee, accept the License Agreement from Alligator. In view of the foregoing, LCL abandoned two then existing trademark applications [S.N. 665,827 and S.N. 700,836] for the word "crocodile" written in the form of a crocodile [Schedule B to License Agreement] for shirts, socks, shorts and dresses.

This Letter of Consent did not make LCL a contractual party to the Settlement Agreement in general or to the License Agreement in particular. At most it represented consideration given by LCL to induce Alligator to enter the settlement with Crystal, its licensee. LCL was thereby prevented from later asserting it did not know of or approve Crystal's entry into the settlement of the 1956 trademark suit. In return, Alligator entered the settlement with Crystal and executed the License Agreement under which Crystal could continue to sell certain Lacoste products in the United States using the crocodile emblem. Alligator did not thereby enter into the Settlement Agreement or License Agreement with LCL.[55]

LCL now argues that it could not possibly have been so foolish as to give up its right to contest Crystal's arrangement with Alligator without any protection from Alligator later amending the License Agreement with Crystal alone. This Court is, of course, not in the position to judge LCL's wisdom in giving its approval and consent as it did under the circumstances with which it was then faced.[56] Instead, the question before

this Court is whether LCL was made a contractually bound party and the conclusion reached by this Court is no.

In support of its contention that it is a contractually bound party, LCL has cited a number of New York cases in its reply brief which support the proposition that where several instruments, executed contemporaneously or at different times and related to the same transaction, they will be read together even though they do not expressly refer to each other or even though some of the documents were executed by parties who have no part in executing the others. McCulloch v. Canadian Pac. Ry. Co., 53 F.Supp. 534 (D. Minn.1943); Kurz v. United States, 156 F.Supp. 99 (S.D.N.Y.1957) aff'd 254 F. 2d 811 (C.A. 2, 1958); Gordon v. Vincent Youmans, Inc., 358 F.2d 261 (C.A. 2, 1965); Koleinimport "Rotterdam" N. V. v. Foreston Coal Export Corp., 283 F.Supp. 184 (S.D.N.Y.1968). There is no dispute that this is the law of New York when a court is faced with the problem of contract construction. Even so, this Court does not find in the cited cases any requirement that a party who executes one document which in some sense pertains to another set of documents must thereby necessarily be considered a bound party to the whole set of documents. Instead, the cases hold that in some circumstances all the documents may be viewed together to determine the intent of the participants. Here, the Court has considered singly and together the Settlement Agreement, Consent Decree, License Agreement and Letter of Consent and concluded LCL was not by its participation in the settlement made a bound contractual party to the Settlement Agreement or the License Agreement.[57]

**55.** While it is unnecessary to the decision of this case to speculate why Alligator insisted in the 1958 Settlement Agreement that Crystal deliver a Letter of Consent by LCL, one possibility is it may have been a cautionary step to foreclose the possibility of a later charge by LCL that Alligator had tortiously interfered with the LCL-Crystal contractual relationship which had begun in 1951.

**56.** See Footnotes 35 and 36, supra.

**57.** LCL would have the Court also consider: (1) LCL's agreement to abandon trademark applications S.N. 665,827 and 700,736; (2) Alligator's withdrawal of opposition to LCL's trademark Application S.N. 700,419; and (3) Alligator's assurance it claimed no right to use the name Lacoste in any form (PX 209) as part of a general settlement

In its final argument in support of its position, LCL urges the Court to look to the subsequent conduct of LCL and Alligator to determine whether LCL had been made a party.[58] With respect to this argument, LCL contends first that Constant, Crystal's then attorney, assured LCL that "both Lacoste and Crystal will be protected to your satisfaction."[59] Second, LCL points out that LCL's fame and reputation were relied on in suits brought by Crystal and Alligator after the settlement against infringers of the Lacoste shirt. These suits, LCL points out, were partially financed by LCL.[60] Third, LCL relies on the fact that three times Alligator allegedly restrained from filing a trademark on the crocodile emblem because Crystal,

LCL and Alligator could not agree on the best method of filing.[61] Fourth, LCL cites a letter from Constant referring to "our continuing tripartite understanding."[62] Fifth, LCL quotes from an exhibit attached to a 1965 Buy and Sell Agreement of Alligator which states:

"The Alligator Company's exclusive rights in the various reptilian designs of which R.N. 75,366 is the earliest registration, are subject to the following royalty free license arrangements with LaChemise LaCoste (LaCoste), a French Corporation, LaCoste's United States licensee David Crystal, Inc. (Crystal) and Crystal's wholly owned subsidiary Izod, Limited (Izod)."[63]

among Crystal, LCL and Alligator. After considering each of these events in conjunction with the formal Settlement Agreement, the Court finds no persuasive reason to alter its conclusion that LCL was not a party to the Settlement Agreement or License Agreement. First, the abandonment of trademark Applications S.N. 665,827 and 700,736 naturally followed after Crystal conceded, with LCL's approval, that Alligator had priority and primacy over Crystal in connection with the use of any crocodile pictorial representation on articles of apparel. Second, Alligator agreed with Crystal to withdraw its opposition to trademark Application S.N. 700,419 before LCL even knew of the Settlement Agreement (See Footnote 29, supra). Third, LCL's request for Alligator to assure it claimed no right in the name "Lacoste" was merely a conservative move by LCL to assure the obvious, and can not be interpreted as evidence LCL was intended by Alligator to be a party to the agreement.

58. LCL is not claiming these later events amended or modified the License Agreement, but rather that they tend to demonstrate the original intent of the participants. See pp. 148–151 of LCL's main brief.

59. PX 198. But, there is no indication that Constant meant by PX 198 that LCL's protection arose from any role as a party to the License Agreement.

60. Docket Item 368, Appendix A, Par. 24.

61. A first plan was for Alligator to use the crocodile emblem for a limited time and then file. A second plan called for LCL to file an application based on a first U.S. use in November 1949. A third plan required Alligator to register the mark based on LCL and

Izod's use of the mark as related companies to Alligator. See LCL's main brief, pp. 48–54.

62. PX 383.

63. PX 665, p. 4 of Exhibit D, Note 1. The remaining portion of the note clarified the situation:

"LaCoste has since 1933 been selling in Europe and elsewhere a quality line of tennis shirts and sportswear with the design of an alligator or crocodile on the neckband label, breast pocket collar and elsewhere. This emblem was used as early as 1923 by an internationally known French tennis star Rene LaCoste who prominently displayed an enlarged version on his shirts and sweaters. M. LaCoste has licensed the French concern LaChemise LaCoste to manufacture the shirts and sportswear with his name and his emblem.

About 1956 the LaCoste line became widely distributed in the United States by Crystal and later Izod. Alligator brought suit against Crystal in New York and opposed the registration of the LaCoste trademark in the United States Patent Office. About the same time a tremendous amount of lower quality sportswear, much of it imported, appeared on the market with an alligator or crocodile emblem sewed on it.

Alligator and Crystal entered a settlement agreement and license dated September 22, 1958 whereby Alligator licensed Crystal to continue selling the LaCoste line with the alligator or crocodile emblem under the supervision of Alligator as to continuing quality standards. Alligator agreed not to manufacture clothes similar

Sixth, LCL refers to a letter by Alligator's trademark counsel referring to "our agreement with David Crystal, Inc. and La Chemise Lacoste . . .".[64] Seventh, LCL uses a letter from Constant, Crystal's attorney, to Abdesselam, LCL's attorney, wherein Constant states:

> "As far as the parties to the new agreement are concerned, [referring to a September 1968 amendment to the License Agreement in which LCL did not participate] the only reason Lacoste was a party to the original agreement was because Alligator insisted upon it."[65] [Brackets added].

And finally, LCL points out that in this very action Alligator alleged a contractual relation existed between Alligator and LCL which LCL had breached.[66]

■■ The general rule in New York is that if a court finds as a matter of law that a contract is unambiguous, evidence relating to the intent of the participants may not change the terms of the contract. Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957); Skinner v. Paramount Pictures, 294 N.Y. 474, 63 N.E.2d 64 (1945). On the other hand, ambiguous terms of a contract can often be defined by the acts of the participants, provided it appears with reasonable certainty that they were acts of both parties, done knowingly and in view of a purpose at least consistent with the particular interpretation of the contract for which they are being used to support. Portsmouth Baseball Corp. v. Frick, 278 F.2d 395 (C.A. 2, 1960), Niagara Falls International Bridge Co.

v. Grand Trunk R. Co., 212 App.Div. 705, 209 N.Y.S. 79 (Sup.Ct.1925) Mod. on other grounds 241 N.Y. 85, 148 N.E. 797 (1925). Also see 17 Am.Jur.2d § 274.

■ In reviewing the conduct of Alligator as presented by LCL, the Court is not persuaded that it erred in its conclusion heretofore stated that LCL was not a party to the License Agreement. The fact that Constant may have assured LCL it was protected does not suggest to the Court that the protection must have come from LCL's role as a bound party. No reason has been advanced why the contemplated protection did not arise from the combination of Crystal's legal ties to Alligator, and LCL's ties to Crystal. The fact that LCL's fame, reputation and money were used by Crystal and Alligator to battle infringers of the Lacoste shirt has no bearing on whether LCL was a party to the License Agreement. Equally unpersuasive are the foiled attempts by LCL, Alligator and Crystal to register the crocodile emblem. They may represent some disagreement as to the existing trademark law but they do not encourage this Court to view LCL as a bound party. Constant's reference to a "tripartite understanding" is not convincing evidence of LCL's role as a party. Admittedly LCL participated in the settlement, but to be a participant to a "tripartite understanding" is not necessarily to be a contractually bound party. The Court finds nothing inherently inconsistent between Constant's language and the Court's findings. The language of the Buy and Sell Agreement is con-

---

to the LaCoste line and further agreed to grant no more licenses under its trademarks. The terms of this agreement were approved by LaCoste and by letter dated July 14, 1959, Alligator and LaCoste agreed to extend its scope to a world-wide arrangement.

Subsequent to the 1958 agreement Alligator and Crystal took legal action against the many infringers of their trademarks and successfully eliminated these third party goods from the market."

64. Docket Item 370A, Exh. 15A. This letter evidently was an opinion by an Alligator trademark lawyer that Alligator could proceed with use of a mirror image crocodile emblem on articles other than those provided for in the License Agreement.

65. PX 566. The question remains whether Constant here intended the word "party" to mean bound member of the License Agreement or participant to the agreement in the sense that LCL gave approval and consent.

66. See Footnote 6, supra.

sistent with the Court's finding when read in context.[67] Two instances of language used by Alligator or Crystal lawyers asserting that LCL was a party are not conclusive when balanced against instances when LCL recognized it was not a party.[68] Finally, Alligator's counterclaim that LCL had breached contractual obligations to Alligator is not conclusive of the question whether LCL was a party to the License Agreement. Even though the counterclaim was withdrawn, factual admissions in a pleading are admissible as evidence. However, legal conclusions are not admissions even though they may prove to be inconsistent with the ultimate position of the pleading party. Giannone v. United States Steel Corporation, 238 F.2d 544 (C.A. 3, 1956). Such inconsistencies are sanctioned by Rule 8(e)(2), F.R.Civ.P. The Court is unable to find that the broad language used by Alligator in its withdrawn counterclaim is reasonably capable of being interpreted as a factual admission that LCL was a party to the License Agreement.

The Court's conclusion therefore stands that LCL was not a party to the License Agreement and cannot now enforce the terms of the License Agreement against Alligator. As a result of this finding, the Court holds: (1) that the cancellation of Paragraph 7 of the License Agreement was not a breach of any contract with LCL; (2) that Alligator's licensing of Knothe was not a breach of any contract with LCL; (3) that Alligator's filing of trademark applications for the crocodile emblem and the mirror image of the crocodile emblem were not a breach of any contract with LCL; and (4) that Alligator's opposition to LCL's filing of trademark applications on the crocodile emblem was not a breach of any contract with LCL.

The Court now turns to the issue of whether the sale by LCL through Patou of toiletries in the United States bearing the crocodile emblem infringes Alligator's trademark rights.

*Trademark Issue*

By an agreement dated June 28, 1968, LCL granted to Patou the exclusive right to use the name "Lacoste" and the crocodile emblem on certain men's toilet articles.[69] The names "Lacoste", "Jean Patou" and the crocodile emblem were to appear on labels, packages and advertising. Toiletries bearing these markings were, in fact, distributed in the United States and LCL has authorized, consented to and received royalties from this distribution.[70]

The outer packages bearing the toiletries[71] have a green or red overall color printed in a design resembling the stitch of the "Chemise Lacoste" shirt.[72] The front of each toiletry package has in the upper right hand quadrant a brief description of the contents and thereunder the crocodile emblem lying on the top of the word "Lacoste". All three of these markings are of approximately equal size. Across the lower quarter of each package are the words "Jean Patou" in large letters with the word

67. See Footnote 63, supra.

68. For example, on December 30, 1963, Abdesselam wrote to Alligator stating . . . "First is the question of the three party relationship between Alligator, Crystal and Lacoste. So far the only existing one is between Alligator and Crystal by way of the license Agreement of August 1958, under which Alligator granted Crystal the exclusive right under Alligator's broader rights to use the word 'crocodile' and the pictorial representation of a lizard-like reptile in connection with the sale of a certain amount of items. The only part Lacoste took in said Agreement was to acknowledge that he had read the Agreement and to agree to accomplish a formal abandonment of his own United States trade-mark applications." PX 387.

69. DX 137.

70. Docket Item 368, Appendix A, par. 15.

71. Exhibits 1–12 to the Richard Lockman deposition, Docket Item 319. These articles include after-shave lotion, toilet water, soap and shave cream.

72. Exhibit O to Affidavit of Ronald E. Larson. Trial transcript (Tr.) 623.

"Paris" written below in much smaller letters. The markings on the containers inside the packages follow the same general arrangement, although on some the markings in the upper right hand quadrant consist of the crocodile emblem alone. On these containers, a side panel displays an outline of the crocodile emblem underscored by the word Lacoste." [73]

Alligator claims that LCL and Patou's use of the crocodile emblem in this manner constitutes an infringement of Alligator's trademark rights and unfair competition with Alligator.[74] Specifically, Alligator argues that its registered trademarks, Nos. 75,365; 251,201; 706,041 and 867,953 [75] are being infringed. Alligator further claims that trademark rights of the crocodile emblem itself, which were developed through use of the emblem by Crystal and Izod, and which inured to Alligator's benefit, are being infringed by LCL and Patou's use of the crocodile emblem on toiletries.

This argument begins with consideration of the 1958 settlement and in particular the License Agreement wherein Crystal with LCL's approval recognized Alligator's rights to the crocodile emblem. Thereafter, Crystal used the emblem as the licensee of Alligator. Alligator asserts that since it maintained sufficient control over Crystal's use of the crocodile emblem, all the good will associated with that use and the emblem's ability to indicate source of origin inure to Alligator's benefit. Alligator therefore concludes that LCL and Patou's use of the crocodile emblem to indicate source of origin constitutes trademark infringement and unfair competition.

LCL and Patou, in counter argument, urge the Court to first determine the common law trademark rights of LCL without considering at all the 1958 settlement. If the 1958 settlement and the License Agreement between Crystal and Alligator were ignored, then LCL argues that Crystal must be considered the licensee of LCL under the 1951 Crystal-LCL license agreement and its amendments.[76] Hence, LCL would have the Court conclude that all the use of the crocodile emblem by Crystal inures to the benefit of LCL and that therefore LCL, as licensor of the crocodile emblem, is free to now license the emblem to Patou for use on toiletries.

As for the 1958 settlement and the License Agreement between Crystal and Alligator, LCL asserts that by its express terms the License Agreement effected trademark rights only as they pertain to articles of apparel and could not possibly effect LCL's trademark rights in the crocodile emblem when applied to toiletries.

LCL further argues that even should Alligator's position as to the effect of the License Agreement be adopted by the Court, LCL's use of the crocodile emblem on toiletries still does not infringe Alligator's rights since toiletries are not sufficiently related to articles of apparel so as to cause confusion in the minds of the public.

The Court concludes that all of LCL's arguments are untenable.

 A trademark is defined in the Lanham Act as "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others."[77] This definition is equally applicable to a common law trademark. Clairol Inc. v. Gillette Co., 270 F.Supp. 371, 376 (E.D.N.Y.

---

73. For example, see Lockman Exhibits 7 and 12.

74. Docket Item 8.

75. 75,365 is a trademark on the "Alligator" name accompanied by a picture of a four legged Alligator; 251,201 is on the word "alligator" in script; 706,041 is on the word "alligator"; and 867,953 is on the design of a half alligator. Docket Item 368, Appendix A, p. 31.

76. PX 659.

77. 15 U.S.C. § 1127.

1967), aff'd 389 F.2d 264 (C.A.2, 1968). It follows from this definition that a trademark must function to identify the source of a product.

▇▇▇ The first step in deciding the trademark aspect of this case is obviously to determine whether in fact the crocodile emblem had been used in the past as a trademark. That is to say, has the crocodile emblem been used in commerce on goods so as to identify the goods with a particular source. It is not necessary for the public to actually know the name of the manufacturer of the goods or the legal owner of the mark; it is sufficient if, when seeing goods bearing the mark, the public assumes the goods came from the same source. See *Victor Tool and Machine Corp. v. Sun Control Awnings, Inc.*, 299 F.Supp. 868 (E.D.Mich.1968), aff'd 411 F.2d 792 (C.A.6, 1969); *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251 (C.A. 2, 1962); *Stix Products, Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 494 (S.D.N.Y.1968); and 3 Callmann Unfair Competition, Trademarks and Monopolies, § 84.1 (3rd Ed. 1969).

It has been stipulated by LCL and Alligator that under Crystal and Izod's authority, a large volume of apparel bearing the crocodile emblem has been distributed in the United States from 1950 to at least July of 1972.[78] A sample of a shirt [79] so distributed indicates that the emblem was prominently displayed in the breast area of the garment. Evidence adduced at trial indicates that up until January 1969, at least LCL shirts bore hangtags having the crocodile emblem printed on them.[80] Witnesses consistently testified that the garments were identified by the crocodile emblem.[81] From this evidence, the Court concludes that the crocodile emblem when used on articles of apparel such as dresses and shirts identifies those articles, in the mind of the purchasing public, with a particular source.[82] In short, the crocodile emblem has functioned in the past on articles of apparel as a trademark.

▇▇▇ The next question which the Court must answer is to whose benefit did the use of the crocodile emblem as a trademark on articles of apparel inure. In the most simple case, one entity manufactures goods, places its trademark thereon and then sells the goods. In such a case, clearly the use of the trademark inures to the benefit of the single entity. The result is less obvious when multiple entities are involved as in the present case. As a general rule, one party who has a valid trademark in a field of commerce may license a second party to use that mark in that field and, provided the licensor maintains sufficient control over the licensee, the use of the trademark by the licensee inures to the benefit of the licensor. *Distillerie Flli Ramazzotti v. Banfi Products Corp.*, 52 Misc.2d 593, 276 N.Y.S.2d 413 (N.Y. Sup.Ct.N.Y.Co.1966); *Susser v. Carvel Corp.*, 206 F.Supp. 636, 641 (S.D.N.Y. 1962), aff'd 332 F.2d 505 (C.A.2, 1964).

▇▇▇ As to statutory law, Section 5 of the Lanham Act, 15 U.S.C. § 1055, provides:

"Where a registered mark or a mark sought to be registered is or may be used legitimately by related

---

78. Docket Item 368, Appendix A, par. 16, par. 21 and insert between pp. 8 and 9.

79. Exhibit O of Affidavit of Ronald E. Larson (Tr. 623).

80. PX 577

81. Docket Item 359, p. 5; Docket Item 360, p. 12; Tr. 433; Tr. 545; Tr. 546; Tr. 591; Tr. 593; Tr. 604; Tr. 605.

82. As pointed out before, it is irrelevant what the public considers that single source to be; that is to say some may associate the source with the distributor, Crystal or Izod; some with Crystal Sunflowers, Inc. and Haymaker Sports, Inc. which had used the emblem under the authority of Izod (Docket Item 368, Appendix A, par. 16) and some with LCL which manufactured many of the articles bearing the emblem. The fact remains that no matter what name the single source was known as, there was but a single path of commerce through which all the articles of apparel bearing the emblem passed, and the emblem is associated in the minds of the public with this path.

companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public." [83]

The term "related company" is defined by Section 45 of the Lanham Act, 15 U.S.C. § 1127, as:

"any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used."

Judge Kirkpatrick, in Alligator Co. v. Robert Bruce, Inc., 176 F.Supp. 377 (E.D.Pa.1959) applied Section 5 of the Lanham Act to the Crystal-Alligator License Agreement and found that if the License Agreement were actually carried out as written, then Crystal would be a related company to Alligator within the meaning of the Act. Although LCL was not a party to the action before Judge Kirkpatrick, LCL has not made any attempt to convince this Court that Section 5 does not apply to the Crystal-Alligator relationship, or that Crystal is not a related company to Alligator. LCL stipulated that Alligator has monitored and controlled the nature and quality of the emblem bearing apparel distributed under the License Agreement.[84] LCL further stipulated that the quality of the apparel bearing an emblem did not fall below the standards set in the License Agreement as amended.[85] In its reply brief, LCL admits:

"The related company status between the Lacoste interest [Crystal and LCL] and Alligator (PX 374) have

been recognized by Alligator and Lacoste from 1958 on."[86]

In light of this position by LCL, the Court will refrain from sua sponte redeciding Judge Kirkpatrick's decision in Robert Bruce, Inc. and the Court will further conclude from the stipulation of LCL that Alligator did indeed carry out the necessary quality control required by the Kirkpatrick decision. As a result, Crystal is found to be a related company of Alligator and, therefore, the use of the crocodile emblem with the sale of articles of apparel inures to the benefit of Alligator.[87]

 Thus, Alligator has valid trademark rights in the crocodile emblem to the extent that the emblem, when used on articles of apparel, is capable of indicating a particular source in the mind of the purchasing public. The next step the Court must take is to decide whether LCL's use of the crocodile emblem on toiletries infringes Alligator's trademark rights.

Trademark rights against infringers have been most aptly described by Judge Learned Hand in Yale Electric Corp. v. Robertson, 26 F.2d 972 (C.A.2, 1928) as expressly adopted by the Third Circuit Court of Appeals in Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79, 82 (C.A.3, 1958). In Yale Judge Hand said at p. 974 of 26 F.2d:

"His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation,

---

83. Alligator has sought to register the crocodile emblem. Docket Item 368, Appendix A, p. 32.

84. Docket Item 368, Appendix A, par. 26.

85. Id., par. 27.

86. Docket Item 388, pp. 50–51.

87. "The benefit of emblem bearing apparel sales inure to Alligator only for the field of

apparel." LCL's reply brief, Docket Item 388, p. 50.

Also see, Turner v. HMH Publishing Co., 380 F.2d 224 (C.A. 5, 1967):

"In our view, Section 5 of the Lanham Act definitely contemplates that a trade or service mark may be acquired through its use by controlled licensees, even though the registrant itself may not have used the mark." (p. 229).

like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful."

██ LCL does not contend that the crocodile emblem used by it on toiletries is not the same in all material aspects as the emblem used by Crystal under the 1958 License Agreement with Alligator. The only question which remains is whether LCL's use of the emblem on toiletries is so foreign to Crystal's use of the emblem on articles of apparel "as to insure against any identification of the two." In other terms, the question reduces to whether or not toiletries are so closely related to articles of apparel so as to cause the purchasing public to believe, when it sees the emblem, that the toiletries came from the same path of commerce as the articles of apparel. See Sears, Roebuck and Co. v. Johnson, 219 F.2d 590 (C.A.3, 1955); Family Circle, Inc. v. Family Circle Associates, Inc., 332 F.2d 534 (C.A.3, 1964); Electronic Com'ns, Inc. v. Electronic Components for Industry Co., 443 F.2d 487 (C.A.8, 1971), cert. den. 404 U.S. 833, 92 S.Ct. 80, 30 L.Ed.2d 63 (1971).

This is particularly true when the mark is a strong trademark. Robert Bruce, Inc. v. Sears, Roebuck & Co., 343 F.Supp. 1333, 1347, n. 28 (E.D.Pa.1972); Alfred Dunhill, etc. v. Kasser Dist. Prod. Corp., 350 F.Supp. 1341, 1357–1358 (E.D.Pa.1972), aff'd 480 F.2d 917 (C.A.3, 1973). In *Dunhill* the Court approved the following analysis of a strong mark from 3 Callmann, Unfair Competition, Trademarks and Monopolies § 82.-1(1), pp. 755–756 (3rd ed. 1969):

"In essence, the distinctiveness and popularity of the trademark will determine its relative strength or weakness and will, accordingly, define the scope of protection to be accorded the mark against the confusing similarity of others. A mark is strong if it is conspicuously distinctive; it is distinctive if the public has already been educated to accept it as the hallmark of a particular source. Then, too, a mark can be distinctive either because it is unique, that is, distinctive in itself, because it has been the subject of wide and intensive advertisement, or because of a combination of both. . . . It seems to follow as a necessary conclusion that the trademark has the advantage of strength where its owner has invested a considerable amount in advertising, or can establish use over a substantial period of time on a great quantity of articles, as symbolic of his business, or has also used the mark as a corporate name." [Footnotes omitted.]

██ In the case at bar, the public has already been educated to accept the crocodile emblem as the hallmark of a particular source.[88] The mark has been the subject of wide and intensive advertisement.[89] LCL admits the mark is distinctive.[90] And, the mark has been used over a substantial period of time on a great quantity of articles.[91] As a result, the Court concludes the crocodile emblem on articles of apparel is a strong mark and should thus be protected from use by others on non-competitive but sufficiently related items which would cause confusion in the minds of the buying public as to whether or not the related items originated from the same source as the articles of apparel.[92]

88. See Footnote 81, supra.

89. Docket Item 368, Appendix A, pars. 13 and 14.

90. "The crocodile emblem has always been a unique and arbitrary mark. . . ." LCL main brief, Docket Item 386, p. 123.

91. Docket Item 368, Appendix A, par. 21 and attached table.

92. LCL's argument that the Crystal-Alligator 1958 License Agreement can only effect use of the mark on articles of apparel is without support. The License Agreement only provides that it "shall not be considered as a waiver express or implied, of any right of either party with respect to any trademark, trade name, word, symbol, or insignia in a field outside the apparel field." It does not

■ It is the accepted rule that infringement may be established by showing only that confusion is likely, and there is no need to show actual confusion or deception if the mark is used in such a way as to likely confuse prospective buyers, and it is also settled that the Court in making its findings may rely not only on the evidence adduced at trial, but on the Court's own comparison of the use of the mark. See Family Circle, Inc. v. Family Circle Associates, Inc., 332 F.2d 534 (C.A.3, 1964).

■ The evidence is overwhelming that the use of the crocodile emblem by LCL on toiletries is likely to and in fact did cause confusion as to the source of the toiletries vis-a-vis the source of the articles of apparel bearing the emblem.

The testimony presented at trial strongly suggests that the crocodile emblem on the toiletries is a dominate factor used by the public to identify the source of the toiletries.

Q. What would you say is the dominate mark on these packages?

A. (Morris) The alligator.[93]

A. (Goodman) You again have the alligator.[94]

A. (Goldberg) The alligator.[95]

A. (Wagner) Naturally it is the alligator.[96]

No evidence has been brought directly to the Court's attention which contradicts the conclusion that the crocodile emblem on the toiletries induces the purchasing public to believe the toiletries came from the same source as the articles of apparel bearing the emblem. In-

stead, the evidence is overwhelming that the public believes the toiletries came from the same source as the articles of apparel.

Q. And would they believe that both the toiletries and the apparel emanated from the same source?

A. (Wagner) I think they would all assume it did or at least originated from the same source.[97]

A. (Morris) I would, in fact, I was fooled.[98]

A. (Goodman) I believe they would.[99]

A. (Goldberg) Yes, sir, I would.[100]

Even LCL's own expert witness, Professor Howard agreed:

A. (Howard) There would be a high probability that they would.[101]

The Court, from the testimony of these witnesses and from a personal view of the articles of apparel and toiletries, agrees that the crocodile emblem on the toiletries does function as an indication of source to the purchasing public and does lead the public to believe the toiletries and articles of apparel come from the same source.[102] To this extent, LCL and Patou's use of the mark infringes Alligator's trademark rights in the crocodile emblem.

■ Instead of arguing that the crocodile emblem does not encourage the public to believe the toiletries come from the same source as the articles of apparel, LCL maintains the emblem encourages the public to believe that both the toiletries and articles of apparel come from Lacoste. This is not determina-

---

provide that the License Agreement can not *affect* subsequent trademark rights which develop outside the apparel field.

93. Tr. 593–94. Eugene Brannon Morris, President and Chairman of the Board of George Muse Company.

94. Tr. 606. Andrew Goodman, President of Bergdorf Goodman Company.

95. Tr. 617. Joel Goldberg, President of Rich's Incorporated.

96. Tr. 553. Richard D. Wagner, Vice President and General Merchandise Manager of the John Wanamaker Stores in Philadelphia.

97. Tr. 554.

98. Tr. 594.

99. Tr. 606.

100. Tr. 618.

101. Tr. 449.

102. In reaching this conclusion the Court also considered instances of actual confusion where retailers have placed written orders for emblem bearing toiletries with Izod. DX 182, DX 183 and DX 184.

tive. It has been established that Alligator can prevent use of the emblem to the extent the emblem indicates that goods bearing the emblem come from the same source as the articles of apparel bearing the emblem. That source is the line of commerce which presents the articles of apparel to the purchasing public and it only includes LCL to the limited extent that LCL manufactured some of the articles of apparel. As pointed out above, the fact that some members of the public may have associated the emblem on articles of apparel, or now associate the emblem on toiletries with the manufacturer LCL, does not of itself destroy Alligator's right to control the crocodile emblem as an indicator of source.[103] The fact remains that the Lacoste-Patou line of commerce from which the toiletries come is not the same as the Lacoste-Crystal-Alligator line of commerce from which the articles of apparel come. Alligator has the right to prevent confusion in the minds of the public between these two lines which derive from LCL's use of the crocodile emblem on toiletries.

In effect, LCL further argues that even if the source of the articles of apparel is technically different from the source of the toiletries, the public is still protected because LCL also controls the quality of apparel bearing the emblem distributed by Crystal as it controls the quality of the toiletries distributed by Patou. Thus, LCL argues the public cannot be harmed by any possible confusion as to source.

In support of this argument, LCL advances the so-called "Learned Hand Doctrine" which raised chaos with the trademark law of the Second Circuit during the forties and fifties. That doctrine began, claims LCL, with a reversal of Judge Hand's impression of trademark law quoted above from *Yale* to a position that unless a merchant can show that he must preserve his trademark identity in a disputed market in order to hold or develop his present business, he can not prevent the use of his mark by others in the disputed market. S. C. Johnson & Son v. Johnson, 116 F.2d 427 (C.A.2, 1940). The doctrine progressed, according to LCL, to the point that a merchant could not prevent use of his trademark even if likelihood of confusion was clearly established provided there was only a slight possibility that the new user's use of the mark would ever tarnish the former user's mark by producing inferior products. Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607 (C.A.2, 1960).

In response to this argument, the Court first points out that LCL has made no attempt whatsoever to demonstrate that the "Learned Hand Doctrine" as defined by LCL was ever applied in the Third Circuit. Nor has the Court independently been able to find any such application. Instead, the original doctrine of Judge Hand, as expressed in *Yale,* is cited as current trademark authority. See *Ambassador East, supra.* Second, the Court is reluctant to conclude that the "Learned Hand Doctrine" as defined by LCL is the current law even in the Second Circuit.[104] A most recent case, King Research Inc. v. Shulton, Inc., 454 F.2d 66, 67–68 (C. A.2, 1972), acknowledged the confusion in the law before 1961 and cited with

103. Also see, In re General Battery and Ceramic Corp., 157 USPQ 121 (T.T.A.B.1968); the combination of a trademark with another name does not of itself constitute abandonment. Drexel Enterprises, Inc. v. Richardson, 312 F.2d 525 (C.A. 10, 1962); Tetra Pak Co., Inc. v. Schneider, 125 USPQ 460 (T.T.A.B.1960);

"The use of several marks by two owners is not infrequent. The two owners may either be licensor and licensee, joint venturers, or an organization with a certifica-

tion mark and its members with their individual house or merchandise marks. No valid objections can be asserted to any of these practices." 3 Callmann, Unfair Competition, Trademarks and Monopolies § 68.4, p. 93 (3rd ed. 1969).

104. For a detailed analysis of the so-called "Learned Hand Doctrine" see McCarthy, Trademarks and Unfair Competition, § 24:9, pp. 143–47.

approval the criteria set out in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (C.A.2, 1961):

"Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account." American Law Institute, Restatement of Torts, §§ 729, 730, 731.

In applying these criteria to the present case, the Court has already determined that the crocodile emblem is a strong mark. The Court has also previously determined that the marks are similar and that the products were sufficiently related to cause a likelihood of confusion in the minds of the public.[105]

There is no evidence that Alligator intends to enter the toiletry market, although there is some evidence of actual confusion by tradesmen.[106] There is no evidence that the toiletries were not quality merchandise. Finally, there is evidence that the sophistication of the buyers was not sufficient to prevent confusion.[107] Balancing these factors,[108] the Court concludes as before, that LCL

and Patou's use of the crocodile emblem on toiletries infringes Alligator's rights in the mark.

### Use Of The Emblem By Alligator

As a final issue, LCL seeks to have this Court enjoin Alligator's use of the crocodile emblem and the mirror image of the crocodile emblem on articles of apparel and on toiletries.[109] With respect to this issue, LCL argues that it is a party to the 1958 License Agreement and that by the language of Alligator's grant to Crystal of *exclusive use* of the emblem on certain listed articles of apparel, Alligator gave up any right it might have had to use the emblem on any articles of apparel.

The Court has already found that LCL was not a party to the 1958 License Agreement and can not enforce contractual obligations of Alligator running to Crystal even if the language of the agreement could be interpreted as suggested by LCL. Therefore, the Court refuses to enjoin Alligator's use of the crocodile emblem or the mirror image of the crocodile emblem on the basis of any obligations in the License Agreement.

LCL has also advanced the theory throughout the history of this long case that LCL has retained certain rights in the crocodile emblem despite LCL's consent and approval of the License Agreement between Crystal and Alligator. This position appears to be founded on the allegation by LCL that the major purpose for the 1958 License Agreement was to permit Alligator and Crystal

---

105. Furthermore, LCL admits "It was the intention of Lacoste to take advantage of the well recognized merchandising policy of making point of sale cooperative advertising and promotion between its apparel and toiletries licensees in the United States," LCL main brief, Docket Item 386, p. 125; that use of the emblem on toiletries was intended to bolster the image of the "Lacoste trademarks" generally, Id. at 124; and that LCL was intending to expand "its" own shirt and dress business by using the emblem, Id. at 135.

106. See Footnote 102, supra.

107. See Footnotes 93–102.

108. "These factors [from *Polaroid*] are variable and relative and no single one, because of its presence or absence, is, in itself, determinative of a case." Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., 411 F.2d 1097, 1099 (C.A. 2, 1969), cert. den. 396 U. S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970).

109. Docket Item 368, p. 11, pars. 13 and 14.

jointly to police counterfeiters of the Lacoste shirt. LCL argues:

"The wording of the license agreement had to be carefully chosen to avoid the danger of establishing independent concurrent rights in the emblem in the Lacoste interests [Crystal and LCL] because such independence could have allowed some third party the possibility of establishing a position of its own independent of both Alligator and Lacoste." [Brackets added].[110]

While this Court will not speculate on whether or not it was necessary to enter the precise agreement found in the License Agreement, the Court does agree with LCL that the agreement did not leave independent concurrent rights in the emblem in LCL; Alligator was set up as the licensor, and as pointed out above in great detail, the use of the emblem under the License Agreement inured to the benefit of Alligator, not LCL. Thus, the Court finds that LCL can not now rely on the use of the emblem by Crystal on articles of apparel distributed since 1958 under the Crystal-Alligator license to prevent Alligator's use of the emblem on articles of apparel or toiletries.[111]

Since LCL has articulated to the Court no additional grounds in support of its position, the Court denies LCL's request to enjoin Alligator's use of the crocodile emblem or mirror image of the crocodile emblem on articles of apparel or on toiletries.

Alligator has as yet shown no actual damages from LCL's and Patou's use of the emblem; therefore, no remedy beyond the injunction prayed for is now appropriate. A. Smith Bowman Distillery, Inc. v. Schenley Distillers, Inc., 198 F.Supp. 822, 829 (D.Del.1961). Because

of the disposition of the trademark infringement issue, it is unnecessary to consider the concurrent claim of unfair competition. *Smith Bowman Distillery* at 829. The injunctive relief requested will be granted on the basis of the infringement claim.

The above shall constitute the findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.

An order will be entered in accordance with this opinion.

---

110. LCL's reply brief, Docket Item 388, p. 39.

111. The Court has considered the case of Standard Oil Co. (Kentucky) v. Humble Oil & Refining Co., 363 F.2d 945 (C.A. 5, 1966), cert. den. 385 U.S. 1007, 87 S.Ct. 714, 17 L.Ed.2d 545 (1967) upon which LCL heavily relies to support its argument that Alligator cannot now use the crocodile emblem on articles of apparel or toiletries. The Court finds, however, that this case upon close analysis is factually and legally inapposite and is not controlling of the present trademark issue.